**BOICE v. BRADLEY et al.**
No. 2616–S.

United States District Court
D. Idaho, S. D.
Aug. 20, 1950.

Jess B. Hawley, Jr., Claude V. Marcus, Wm. H. Langroise and Willis E. Sullivan, all of Boise, Idaho, for plaintiff.

Oscar W. Worthwine, Boise, Idaho, John Parks Davis, San Francisco, Cal., Ralph R. Breshears, Boise, Idaho, George Donart, Weiser, Idaho, for defendants.

CLARK, District Judge.

This was an action for false imprisonment and slander. The plaintiff, Edward H. Boice, was a doctor living with his wife and children at Stibnite, Idaho, where he had resided since March, 1947, occupying an apartment provided as an incident of his employment by the defendant Bradley Mining Company. He held the position of company doctor and manager of the company hospital.

Dr. Boice was raised in Texas, and was graduated from the University of Texas Medical School in 1942, having taken his pre-medical work at Rice University, Houston, Texas. Following his graduation from medical school, he took a one-year rotating internship, covering all branches of medicine, at Jefferson Davis Hospital. Subsequently, he had offers to go into practice in Houston and offers to take further hospital residency work at Jefferson Davis Hospital and Santa Fe Hospital. He had been licensed to practice medicine in Texas. Instead of accepting any of the offers, he voluntarily entered the Army of the United States, going on active duty on July 12, 1943, at Ellington Field, Texas, with the rank of first lieutenant. From there he went to Carlyle Base in Pennsylvania for training, then to Jefferson Barracks, St. Louis, Missouri, where he served a residency in surgery in the Army. Jefferson Barracks was a basic training camp with a large hospital. After about ten months there, he was transferred to Sioux Falls Army Air Base, in South Dakota, where he was engaged in both surgery and general medicine. He remained there a year and a half. From there he went to Orlando, Florida, for a couple of months, then to Truax Field, Wisconsin, for a couple of weeks; then to Harlington Air Base, Harlington, Texas. The war was over and the bases were closing down. He was separated from the service on October 19, 1946, with the rank of Major.

Following his separation from the Army it was necessary for him to find a location to practice his profession. He took a trip through the Northwest with the idea of settling in this area. He made various inquiries throughout the Northwest as to openings for doctors and wrote to medical associations in California, Oregon and Washington concerning opportunities. He returned to Texas and had about decided to settle down in Houston and practice his profession there. He had begun negotiations for buying a home there, as well as office equipment. During this time, in December, 1946, he received communications from defendant Bradley Mining Company by telephone and by letter, and was asked if he would come out and discuss the position at Stibnite. In January, 1947, he came to Boise, where he was met by an executive of the Bradley Mining Company, and they proceeded to Stibnite so that Dr. Boice could look over the facilities there and learn the details of the position. He entered into a contract with defendant Bradley Mining Company at that time to operate the defendant's hospital and practice medicine in Stibnite. He then went

back to Texas for his possessions and family, and returned to Stibnite with his family on the first of March, the beginning date of his contract. Meanwhile he had obtained his license to practice medicine in Idaho.

Plaintiff testified in substance that on May 14, 1948, he was handed a letter of dismissal by executives of defendant Bradley Mining Company, that he was ordered to go to his apartment and to stay there, and that the company placed armed guards around his apartment and kept them on constant watch for three days, or the better part of three days, to prevent him from leaving; also that he was ordered not to see his patients and not to enter the hospital. This was a matter of common knowledge throughout Stibnite. He testified further that certain defamatory remarks were made to and concerning him, in the presence of unprivileged persons, by executives of defendant company. Plaintiff's wife, Catherine Boice, similarly testified to the placing of armed guards around the apartment, as well as to certain defamatory remarks made concerning plaintiff. Specifically, the slanderous remarks charged were to the effect that plaintiff was crazy; that he was insane before he went to Stibnite and still was; that he was a mental case; that he was insane and had to be kept under guard to keep from harming his patients and shooting up the town; and that he had committed an illegal abortion.

Both plaintiff and his wife testified that they were compelled, against their will and while their children were ill, to leave Stibnite late at night on the 16th of May, 1948, and to drive their car over the impassable road toward Cascade; that they were followed out of town by the Deputy Sheriff's car; and that the roads were in such a condition that they were delayed for two hours and eventually got to a Dude Ranch down the road, where they all stayed for about a week before Dr. Boice undertook to drive on to Cascade, leaving his wife and three infant children, aged one, two and four years, at the Dude Ranch; and that it was some time later before Dr. Boice could return to the Dude Ranch and remove his family to Cascade and on in to Boise.

There was evidence that defendant company's switchboard operator was instructed by an executive of defendant company on May 16 not to take any more telephone calls for the Boices and that plaintiff's telephone was cut off in his apartment. While damages for this treatment were not prayed for, it was competent in support of the allegation of malice.

The testimony of plaintiff and his wife relative to some of the slanderous statements and relative to the armed guards stationed around plaintiff's apartment was corroborated by other competent witnesses. The defendant offered evidence that was in direct conflict with the testimony offered by the plaintiff. It denied the false imprisonment, and as to this phase of the case the defendant's evidence was to the effect that guards were placed in the hospital (adjacent to the Doctor's apartment) only for the purpose of keeping the Doctor out of the hospital and not for the purpose of keeping him in the apartment as alleged in the complaint.

As to the slanderous statements alleged, the defendants offered testimony in an attempt to show that no slanderous statements were made; also some testimony tending to show that if such statements were made they were within the rule of privilege; and there was also some evidence to the effect that if such statements were made and were slanderous they were true.

As to the allegation that the officers of the Bradley Mining Company had made statements to the effect that the Doctor had committed an abortion or an illegal abortion, a great deal of evidence was introduced, a number of nurses from the hospital testifying to being in attendance at an operation performed on a Mrs. Wood— specifically, a hysterectomy—during the performance of which a live baby of approximately six months was taken and placed in a sponge basin, where it kicked for some minutes. This particular testimony was denied, on rebuttal, by one nurse who was in attendance at the operation. Mrs. Wood was called, in rebuttal,

and testified that she had five children, that within a short time after conception in each instance she knew that she was pregnant; also that at the time she entered the hospital for the hysterectomy she had no knowledge of any pregnancy.

A great many witnesses were called by the defendant who testified to actions on the part of the Doctor to substantiate the statements that the Doctor was insane.

It was the privilege and the duty of the jury to evaluate the testimony, and it is manifest from the verdict that the jury believed the testimony of the witnesses for plaintiff, or at least believed a substantial part of it. It is evident that the jury determined that the slanderous charges were not true.

■ The jury was instructed that plaintiff had alleged false imprisonment and five separate slanderous statements by the defendants and that it was not necessary, in order to find in favor of the plaintiff, that all of those matters be proved by a preponderance of the evidence but that it was sufficient if they should find any one or more of the allegations to have been so proven. There is much conflicting testimony. However, it was solely for the jury to determine what testimony to believe, as quoted with approval by the Supreme Court of Idaho in the case of Summerfield v. Pringle, 65 Idaho 300, 144 P.2d 214. The Court cannot determine from the verdict, of course, the precise allegations which the jury found to be proved by the evidence.

The jury was instructed that exemplary or punitive damages could be awarded if it first found that actual damages had been sustained or suffered by plaintiff, and further instructed that exemplary or punitive damages in addition to the actual or compensatory damages could be allowed if it found that the false imprisonment, if any, was wanton, malicious or gross and outrageous, or the facts such as to imply malice and oppression. As to punitive damages in addition to compensatory damages for the alleged slander, the jury was instructed that such could be allowed if it believed from the evidence that the defendants were prompted by actual malice in making the defamatory statements, and

that the law presumes or infers that such statements were made maliciously, if made at all, because they are slanderous on their face, and that inasmuch as defendants had, during the trial, denied making the slanderous statements, such denial could be considered in determining whether or not there was actual malice on the part of defendants if it was determined from the evidence that the statements were in fact made by defendants. There can be no doubt that the jury found that the defendant Bradly Mining Company acted maliciously. The jury was instructed that plaintiff could not claim damages for acts of his own, or for the publicity given to the matter by bringing this action.

Subject to the above and other detailed instructions on the law governing damages, the only restraint placed on the jury by the Court's instructions with respect to the amount of damages that could be awarded was that the amount could in no event exceed the amounts prayed for in the two causes of action set forth in the complaint, to wit, $150,000.00.

■ The jury awarded the plaintiff $60,000.00 damages against the defendant Bradley Mining Company, and the case is now before the Court on the defendant's motion for a new trial, the motion being based on the ground that the jury did not follow the instructions of the Court, that the evidence did not support the verdict, and that the verdict is excessive. There were no objections made by the defendants to the instructions nor was there any motion made to reduce the amount prayed for as being excessive, prior to the submission of the case to the jury and entry of judgment on the verdict. The Court must assume that the jury followed all of the instructions of the Court. There is ample evidence to support a verdict for the plaintiff.

■ This leaves only for the Court the consideration of the question of excessive damages. As a broad general rule, the damages must be reasonable whether merely actual damages or actual and exemplary damages. Unless the amount is so unconscionable as to impress the Court with the

injustice of the award, and thereby induce the Court to believe that the jury was actuated by passion, prejudice or partiality, there will usually be no interference with the jury's verdict. At the very threshold of this inquiry it must be remembered that the Constitution of the United States, Amendment 7, and of this State, art. 1, § 7, as well as all other States, has secured the right of trial by jury in civil actions by the words, "shall be preserved" or, as stated in the Constitution of the State of Idaho, "shall remain inviolate". If this mandate is to be obeyed the Court must proceed with caution when a motion such as is now before this Court is considered, with the thought in mind that if the Court is going to set aside the verdict for no reason except that the Court feels it is excessive, this constitutional provision will be violated and a jury trial would be a useless thing if in the final outcome the Court could supplant its opinion in place of the opinion of the jury.

The Court is convinced that the jury was not actuated by passion, prejudice or partiality but that the jury acted in good faith and that the verdict was the result of the cool and dispassionate discretion of the jury. The question of excessiveness is primarily addressed to the discretion of the trial court with the constitutional provision above referred to in mind, each case being considered on its own facts. While the amount awarded as exemplary damages is not dependent on the amount of the general or actual damages, still it must be reasonable.

There is no scale nor definite standard by which the damages from slander can be ascertained, but the amount must be governed by the circumstances of each particular case and the allowance made by the jury will not be set aside by the courts unless it clearly appears to have been arrived at through passion or prejudice. The law does not prescribe a definite rule for the ascertainment of the exact amount of damages recoverable for false imprisonment, such question being primarily one for the determination of the jury. In fixing the amount of the award, the jury is justified in exercising a liberal discretion, taking into consideration all the items for which damages may properly be awarded.

Beyond the broad general rule just mentioned, there are special considerations singularly applicable to the case at bar. According to the great weight of authority, defendant's pecuniary ability may be considered in fixing the amount of punitive or exemplary damages. There was ample evidence in this case from which the jury could have inferred, and must almost certainly have inferred, that the defendant Bradley Mining Company was a wealthy company. There is also authority that the status of plaintiff may be considered in fixing the amount of the award. In this case, plaintiff was a young professional man who was endeavoring to get a start. He had not established an enviable reputation in his profession for he had been practicing only a short time. The jury doubtless took into consideration the fact that the abuses were more likely to injure him than if he had been practicing his profession for many years and had already established a good reputation and following as a physician. Behrendt v. Times Mirror Company, 30 Cal.App.2d 77, 85 P.2d 949.

There is still another consideration which is as obvious as it is important, and that is that radical changes have taken place in recent years affecting potential earnings and the cost of living. Verdicts might logically be approved today which would have been unhesitatingly set aside as excessive not so long ago.

Juries have a wider discretion in the matter of punitive damages for slander and false imprisonment than in the matter of compensatory damages, and the Court should not substitute its judgment for the judgment of the jury, even though the Court may be entirely dissatisfied with the jury's verdict. The power of the Court in this respect is limited to granting another trial or, which is to the same effect, giving the plaintiff an option to accept a lesser sum than the verdict awards or submit to a new trial. There must be a very careful limitation to the exercise of this power by

the Court, lest it result in the exhaustion of the parties. The trial of this case occupied approximately six weeks. Another trial would likely be a heavy burden to place upon the parties litigant and there is no assurance that a new jury would return a different verdict.

It is the opinion of the Court that the jury in this case was very stable, capable, attentive and conscientious. The jury in this case served for a considerable time in this Court and the Court was impressed by the quality and fairness of the jury in all cases where different members of this jury served. This being true, the Court is reluctant to interfere with the jury's determination and it is questionable whether the Court would be justified in doing so. The verdict is for a large sum, a large portion of which must necessarily be for exemplary damages. It would have been preferable for the Court to have submitted two forms of verdict, one for general damages and one for exemplary damages, so that the Court could be advised in regard to the finding of the jury in arriving at the verdict. The jury was advised as to the limit it could go in assessing damages against the defendant. For the Court to say to a jury, this you can do, and then when the jury has acted say that it acted wrongly, discredits the Court if the Court on that ground sets aside the verdict.

Counsel for defendant have moved to set aside this verdict which the Court now has before it and have asked that a new trial be granted. This verdict was the best judgment of twelve jurors, with the judge during the course of the trial directing them as to matters of law emerging from the evidence. "The jury assisting the judge in determining the matter of fact and the judge assisting the jury in determining points of law, a jury trial has the advantage of the judge's observation, attention and assistance in points of law by way of decision and in points of fact by way of direction to the jury." 2 Hale Hist. Com. Law, 5th Ed., 147, 156, cited Capital Traction Company v. Hof, 174 U.S. 1, 14, 19 S. Ct. 580, 43 L.Ed. 873.

The defendants plead and endeavored to prove a double-barreled defense—first, that they had not made the slanderous statements charged, and second, that the statements made as to the Doctor's committing an illegal abortion and that he was insane were true. In support of this second defense, the defendants spent several weeks with a large number of expert medical witnesses. The jury no doubt found that the defendants had made the statements and also determined that the statements were not true. The Court instructed the jury, as hereinbefore stated, that inasmuch as defendants had during the trial denied making the slanderous statements, such denial could be considered by the jury in determining whether or not there was actual malice on the part of the defendants if it was determined that the statements were in fact made by the defendants.

■ The Court is not unmindful that this is a large verdict. However, it must be remembered that no doubt the jury considered the fact that Dr. Boice has, on account of the acts of the defendants, had a poor start in the practice of his profession and has suffered abuses at its hands, and that the amount of damages allowed was the jury's best judgment. This being true, the Court is of the opinion that it would not be justified in interfering with the jury's determination, and an order is filed in harmony with this opinion.